UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | | |
| vs. | ) | No. | 2020 CR 20037 |
| | ) | | |
| RYAN M. RODDIS, | ) | | |
| | ) | | |
| Defendant. | ) | | |

**DEFENDANT'S SENTENCING MEMORANDUM AND COMMENTARY ON SPECIAL SENTENCING FACTORS**

Defendant, Ryan Roddis, by his attorney, Brian Hiatt, submits the following memorandum with regard to his sentencing hearing scheduled for July 18, 2025.

**INTRODUCTION**

Ryan Roddis' position before this Court can be traced back to 1982, the year he was born, when he and his mother were abandoned by his natural father. That man now is a college professor in Georgia, and after Roddis reached out to him in 2009, he told Roddis that he doubted whether he was really his father. Aside from the hurt this must have caused Roddis, one wonders how different his life would have been if he had such an educated and accomplished father figure raising him.

Instead, Roddis's real father was succeeded by his wife's first husband, who adopted him and gave him his surname. But this man divorced Roddis' mother when he was five years old, and Roddis never had a relationship with him. The next man to enter his life physically abused Roddis, prompting him to run away from home at as early as age 11. Roddis' mother eventually divorced him when Roddis was 18, and now is married to her third husband, with whom Roddis has no more than a "cordial" relationship.

1

It is not surprising, then, that Roddis' childhood was filled with trouble: struggles with school, difficulties with his abusive stepfather, and a juvenile court record that began when he was 16 years old and led to him being sentenced to a term in the Illinois Department of Juvenile Justice.  That set the table for a blighted adult criminal record: concurrent Illinois prison sentences at age 19 for two separate felonies and a consecutive sentence imposed at the same time for a third, then another Illinois prison sentence at age 21, a California felony conviction and jail sentence at the same age, and then four subsequent felony convictions and three prison sentences after that.

To the government and the casual observer, Roddis' record may present him as a clear menace to society.  But the man before the Court for sentencing is quite different; for that matter, he is a different person from the one who chose to make some easy money and sell methamphetamine to a confidential informant in 2020.  Roddis is now 43 years old.  His years of criminal livelihood are past.  He is a father, a trusted inmate and an older, wiser and remorseful individual who takes responsibility for his crimes.

## COMMENTARY REGARDING SENTENCING FACTORS

Roddis pled guilty to Counts 1 and 2 of the indictment.  For both counts (distribution of 50 grams or more of actual methamphetamine), the statutory minimum term of imprisonment is 10 years, and the maximum term is life.  *21 U.S.C. § 841(a)(1), (b)(1)(A)(viii).*  In addition, the indictment contains special findings regarding Roddis' prior felony convictions pursuant to 21 U.S.C. § 851.  One of these convictions, the 2012 aggravated domestic battery case, was pending before the Illinois Supreme Court at the time of Roddis' conduct, so it had not become final.  *21 U.S.C. § 841(b)(1).*   The other was determined by this Court in prior litigation to constitute a "serious violent felony," which raises Roddis' statutory minimum sentence to 15 years.  *Id.*

2

The two transactions to which Roddis pled guilty involved a total of 217.1 grams of actual methamphetamine.  But, relying upon his post-arrest statement that he had purchased approximately 40 pounds of methamphetamine from a distributor, the probation officer found him accountable for over 17 kilograms of actual methamphetamine.  Despite having no upward adjustments (as is common with controlled substance offenses), Roddis has been scored a base offense level of 38 - the highest guideline level possible for drug crimes.  On top of that, he has been rated a career offender due to his prior convictions, resulting in the highest criminal history category of VI.

### A.    Relevant Conduct

Roddis made his statements while being debriefed by law enforcement agents who were evaluating his usefulness as an informant.  He had good reason to talk up his significance in the local methamphetamine trade: if he could get the agents large dealers such as "Bella" - a woman who, he said, was the girlfriend of a local drug distributor, and who had been his supplier - he might be released to work as an informant.  And it succeeded: Roddis was released pending further investigation and cooperated with authorities for a period of time.  His statements cannot be taken at face value given the extenuating circumstances of his arrest and the clear incentive he had to maximize his importance as a link in the local drug distribution chain.

Courts of appeals, including the Seventh Circuit, have dismissed and even mocked this explanation for a defendant's post-arrest admissions of prior drug activity.  *See, e.g., United States vs. Johnson,* 342 F.3d 731, 734 (7th Cir. 2003) (in affirming determination of relevant conduct from defendant's statement that he had dealt one ounce of crack every day for the previous seven or eight months, noting that such statements "have long been considered reliable enough for use at trial" and thus were reliable enough for sentencing); *United States vs.*

*Stephenson,* 557 F.3d 449, 457 (7th Cir. 2009) (in rejecting defendant's assertion that he exaggerated the amount of his sales to curry favor and inflate his value as a potential informant, finding that "[t]here was no evidence to suggest that Stephenson was exaggerating his drug dealing activities"); *United States vs. Barfield,* 941 F.3d 757, 764 (5th Cir. 2019) (commenting that "it hardly seems 'self-serving' to *over* state one's involvement in criminal activity"). And the government can be expected to retort, as it did in *Barfield,* that "the idea of inflating drug trafficking conduct to discourage arrest does not comport with logic or common sense. On the contrary, traditionally, a defendant downplays [his own] criminal involvement." *Barfield,* 941 F.3d at 764.

These dismissive responses simply do not account for the reality of the situation faced by Roddis. This Court surely is familiar with the tactics used by law enforcement agents in drug cases: set up controlled transactions using an informant who himself has been pinched and has agreed to cooperate, ensnare the target, detain him, immediately lean on him to cooperate himself, and then rinse and repeat with someone else higher up the drug distribution chain. Roddis knew what was expected of him, and he played the part well.

It is facile to wave off Roddis' explanation as atypical among defendants who ordinarily minimize their criminal activity, because that is not how drug investigations work. An arrestee who insists that this was the one time in his life that he sold drugs is of no use to law enforcement. But one who can provide agents with information leading to more arrests, more seizures, and more convictions is. Furthermore, Roddis had been caught red-handed dealing large amounts of methamphetamine twice. What good would it do for him to downplay his activity? He was in enough trouble as it was, and his best opportunity to regain his freedom was to cave to the pressure of the agents interviewing him and make himself appear to be an

important cog in the local drug trade.

At the very least, this Court should find that the substantial increase occasioned by the conduct attributed to Roddis - from base offense level 32 for 150-500 grams of actual methamphetamine to 38 - requires proof by clear and convincing evidence, so as to prevent the sentencing hearing from becoming "a tail which wags the dog of the substantive offense." *Johnson,* 342 F.3d at 735 (concurring with decisions of other circuits that "due process considerations may, at some point, require a greater showing for a dramatic increase"). If the government is to hold Roddis accountable for conduct based on his questionable admissions, it should be held to an exacting standard under these circumstances. Roddis, in turn, will rebut the government's showing with his explanation for his admissions. His explanation deserves careful consideration and casts doubt on Probation's calculation, enough to justify finding that his relevant conduct should be limited to the 217 grams he actually distributed to the informant.

### B.    Career Offender Status

Liberated from the mandatory guidelines in the post-*Booker* era, a "growing chorus" of district courts have refused to apply the career offender guidelines in certain cases. *United States vs. Newhouse,* 919 F. Supp. 955, 967 (N.D. Iowa 2013). The consequences of being deemed a career offender are "grave," leading to "staggering and mind numbing" increases in federal criminal penalties that result in non-violent, "low-hanging fruit" defendants filling federal prisons to capacity and beyond. *Id.,* at 958. There is "no question that the career offender guidelines are flawed." *United States vs. Whigham,* 754 F. Supp. 239, 247-248 (D. Mass. 2010). They have been found to overstate the defendant's likelihood of recidivism, compelling district courts to vary downward. *United States vs. Poindexter,* 550 F. Supp. 578, 582 (E. D. Penn. 2008).

Post-*Booker,* a district judge may disagree with the policy statements of Guideline §

4B1.1 "categorically, as well as in a particular case." *United States vs. Corner*, 598 F.3d 411,

416 (7th Cir. 2010). After all, it "is just a Guideline," with floors and ceilings that are no longer

legally binding. *Id.,* at 416. Thus a judge may take into account not just what the Sentencing

Commission recommends, but the Section 3553 factors in determining whether the career

offender guidelines should be followed. *Id.*

Roddis is in a relatively unusual position in that his criminal conduct - assuming the

Court agrees with the relevant conduct calculation of Probation - places him at a higher base

offense level (38) than he would be assigned by virtue of his career offender status (37). If the

Court agrees with him regarding the proper calculation of that conduct, however, he would still

suffer a five-level increase from 32. And application of the career offender guidelines results in

him being assigned a criminal history category of VI, one level higher than his actual category of

V.

The legion of district court opinions expressing disagreement with the career offender

guidelines cannot be ignored here. Roddis already faces a statutory penalty of a minimum of 15

years due to his criminal history. If he is assigned level 38, even after his acceptance of

responsibility the range is a breathtaking 292-365 months; if he is assigned the career offender

level of 37, it is still 262-327 months. By contrast, without reference to Guideline § 4B1.1,

Roddis would have a guideline range around the statutory minimum if the Court agrees with his

relevant conduct calculation (140-175 months).

A quirk of Roddis' history and characteristics is that drug activity is largely absent from

his criminal record. He has one felony conviction for possession of cannabis with intent to

deliver from Macon County in 2002. The subsequent decriminalization of Illinois cannabis law

and the relatively low amount involved in that case (30-500 grams) suggest that the case may well have been handled differently today by an Illinois court.  But clearly Roddis is not a lifelong drug dealer who continued to return to the lucrative drug trade despite his prior sentences.  His criminal history is one of hot-blooded offenses (aggravated battery, aggravated domestic battery, resisting arrest, etc.) that were committed during his youthful, testosterone-laden years between the ages of 18 and 30.  He is not "the repeat drug trafficker envisioned by Congress engaged in an 'extremely lucrative' enterprise."  *Newhouse,* 919 F. Supp. at 986.

Application of the career offender guidelines to Roddis overstates his criminal history and fails to accomplish the objective of those guidelines to target those who return to the drug trade time and again.  This Court is free to vary from them pursuant to *Corner.*  Taking into account the disagreements expressed by numerous other district courts, and considering the Section 3553 factors, it should do so here.

### C.    Actual Methamphetamine Guidelines

In June 2024, the United States Sentencing Commission released a comprehensive analysis of federal methamphetamine trafficking offenses, its first such effort since 1999.  The third "key finding" of the report was that "[m]ethamphetaine is highly and uniformly pure."  *See,* United States Sentencing Commission, *Methamphetamine Trafficking Offenses in The Federal Criminal Justice System,* p. 4, www.ussc.gov/sites/default/files/pdf/research-and-publications/ research-publications/2024/202406_Methamphetamine.pdf.  According to the report, the methamphetamine tested in federal criminal cases during fiscal year 2022 was "uniformly highly pure whether it was sentenced as methamphetamine mixture (91% pure on average), methamphetamine actual (92.6%) or Ice (97.6%).  *Id,* p. 9.  In other words, whether the methamphetamine was alleged to be a mixture, actual or ice mattered little; all three categories

7

on average tested to be more than 90 percent pure.

The guidelines, however, draw a significant distinction between equivalent amounts of actual methamphetamine and methamphetamine mixture.  Under the guidelines, one gram of actual methamphetamine is punished at the same level as 10 grams of mixture.  This 10 to 1 ratio has existed since 1989.  But as the Commission's report shows, attempting to contrast the tested purities of "actual" methamphetamine with "mixture" methamphetamine amounts to drawing a distinction without a difference.  The average purity of methamphetamine exceeds 90 percent across the board, whether "actual," "ice" or "mixture."

The guidelines' disparate treatment of pure substances reflects an outdated belief that purity correlates with a dealer's higher position in the distribution chain.  As the notes to Guideline 4B1.1 provide:

> The purity of the controlled substance, particularly in the case of heroin, may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution. Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs. As large quantities are normally associated with high purities, this factor is particularly relevant where smaller quantities are involved.

*U.S.S.G. § 4B1.1, note 27(C)*.  The purity of the methamphetamine distributed, therefore, is proportionate to one's culpability under the guidelines.  But as can be seen from the survey of tested methamphetamine above, "[t]oday, most methamphetamine seized at all distribution levels is remarkably pure, which means that higher purity is not a good indicator of a defendant's place in the chain of distribution."  *United States vs. Hendricks*, 307 F. Supp. 3d 1104, 1108 (D. Idaho 2018).

In light of this reality, numerous district courts have taken the 10-1 ratio to task.  "Due to increases in the average purity of methamphetamine sold today, purity is no longer an accurate

indicator of a defendant's culpability or role in a drug enterprise, and the presumptive purity

assigned to untested drugs does not reflect market realities." *Hendricks,* 307 F. Supp. 3d at 1105.

While "there was once some truth to the Commission's assumption that large quantities are

associated with high purities, because methamphetamine was cut as it worked its way down to

the street-level dealer or user. . . that is no longer the case." *United States vs. Nawanna,* 321 F.

Supp. 3d 943, 951 (N.D. Iowa 2018). And as Judge Brack of the District of New Mexico

incisively put it:

> The point, then, of increasing a defendant's sentence based on drug purity is to
> punish defendants who have prominent roles in drug distribution. However, the
> Commission's assumption regarding the connection between methamphetamine
> purity and criminal role is divorced from reality. As illustrated above, the average
> purity of methamphetamine today is over 90 percent. This means that the
> sentencing Guidelines would treat the average individual convicted of a crime
> involving methamphetamine as a kingpin or leader, even though that simply is not
> true.

*United States vs. Ibarra-Sandoval,* 265 F. Supp. 3d 1249, 1255-1256 (D. N.M. 2017).

These decisions, as this Court surely knows, are but a small sample of the district

court opinions throughout the country that have criticized the guidelines' disparate

treatment of "actual" and "mixture" methamphetamine. Moreover, each of these

decisions have observed that the 10-1 ratio does not reflect an empirical approach on the

part of the Commission to determine the appropriate sentence for drug offenses, thereby

freeing them to vary from the guidelines based upon policy disagreements.

*Ibarra-Sandoval,* 265 F. Supp. 3d at 1253 ("[c]onsequently, the drug offense Guidelines

are not a reflection of the Commission's institutional strengths, and a district court has

more discretion to vary from the drug offense Guidelines based on policy disagreements

than in a case where the applicable guidelines were promulgated pursuant to the

Commission's usual empirical approach"); *Nawanna,* 321 F. Supp. 3d at 950

(policy-based rejection may be appropriate "when those Guidelines provisions 'do not exemplify the Commission's exercise of its characteristic institutional role."); *Hendricks,* 307 F. Supp. 3d at 1106-1107 (10-1 ratio "was, by its very nature, a product of political calculation and compromise rather than empirical analysis"); *see also, Kimbrough vs. United States,* 552 U.S. 85, 109-110 (2007) (because Commission did not take account of empirical data and national experience in fashioning crack cocaine guidelines, district court had discretion to conclude that the crack/powder disparity yielded a sentence "greater than necessary" to achieve § 3553(a)'s purposes).

In *Nawanna* and *Ibarra-Sandoval,* the district courts expressed their policy disagreement by applying the methamphetamine mixture guidelines to determine the defendant's appropriate sentence. *Nawanna,* 321 F. Supp. 3d at 956; *Ibarra-Sandoval,* 265 F. Supp. 3d at 1256-1257. This Court should concur with the above-stated criticisms of the 10-1 ratio and follow a similar approach here. Such a policy-based disagreement with the guidelines would not be simply a windfall to Roddis. It would reflect the Court's recognition that the ratio has no empirical basis and is based upon flawed and antiquated assumptions that, however well-intentioned, do not comport with the reality of the modern methamphetamine trade.

## ARGUMENT

If the career offender guidelines are not applied, and the Court accepts his invitation to use the methamphetamine mixture guidelines, Roddis faces a range of 210-262 months (using the relevant conduct calculations of Probation) or 84-105 months (using only the amounts from the two January 2020 transactions). If the career offender guidelines are not applied and the Court uses the actual methamphetamine guidelines, the range is either 262-327 months or

140-175 months; if the Court rejects all of Roddis' arguments regarding the guidelines, his range is either 292-365 months or 262-327 months. Clearly, most of these potential sentences far exceed the statutory minimum penalty of 15 years. Roddis should receive a sentence at or near the statutory minimum, taking into account both the departure provisions of the guidelines and the Section 3553 factors.

### A.    Grounds for Departure

Guideline 4A1.3(b) provides for a downward departure "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." *U.S.S.G. 4A1.3(b).* Roddis' criminal history, while considerable, involved conduct during his years as a troubled young adult. But he is now 43 years old, and if he receives a 15 year sentence, he still will exit prison in his early fifties, even with his approximately five years of time served. At an age when most people begin contemplating retirement and enjoying their grandchildren, Roddis will be starting over with his life and grappling with the difficulty of finding employment, shelter and sustenance as a middle-aged convicted felon.

Roddis' youthful misconduct evokes the 2024 amendment to Guideline 5H1.1, which provides:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

> The age-crime curve, one of the most consistent findings in criminology,

11

> demonstrates that criminal behavior tends to decrease with age. Age-appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing.

*U.S.S.G. 5H1.1.* If a checklist was created to enumerate the risk factors identified by the Commission, Roddis would mark an 'X' next to every one. His troubled childhood undoubtedly explains much of his criminal history, and his youthfulness at the time of his crimes negates any suggestion that he is likely to repeat his criminal conduct when he is released.

Furthermore, Roddis' projected age at the time of his release straddles the demarcation that sharply divides the recidivism rates of younger and older offenders. In July 2022, the United States Sentencing Commission found that among offenders released from federal prison in 2010, the recidivism rate for federal offenders over age 50 was less than half (21.3 percent) of that of those under 50 (53.4 percent). United States Sentencing Commission, *Older Offenders in The Federal System,* p. 41-43, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf. The most common form of recidivism was a violation of probation, parole or supervised release, and not necessarily a new criminal offense. *Id.,* at p. 44. Offenders over 50 were nearly half as likely to reoffend by a violent crime (19.2 percent) than those under 50 (32.1 percent). *Id.*

These rather recent findings counsel that Roddis will be unlikely to reoffend even if he receives a minimum sentence and is released in his early fifties. Protection of the public does not require a 20-something year commitment to the Bureau of Prisons. A 15 year sentence guards sufficiently against recidivism, and to the extent this Court finds that Roddis' guideline range exceeds the statutory minimum, Guidelines 4A1.3(b) and 5H1.1 support a downward departure to or towards it.

**B.     The Section 3553(a) Factors**

The guidelines range, while being "the starting point and the initial benchmark," is not the only sentencing consideration. *Gall vs. United States,* 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed. 2d. 445 (2007). This Court must consider all of the Section 3553(a) factors to determine whether they support the sentence requested, and may not presume that the guideline range is reasonable. *Id.,* at 49-50. Application of the Section 3553(a) factors here shows that the statutory minimum, or a sentence in its neighborhood, is appropriate. As Roddis has already discussed extensively the applicable guidelines and policy statements, he focuses on subparagraphs (1), (2) and (3).

**1.     The Nature and Circumstances of The Offense and The History and Characteristics of The Defendant [18 U.S.C. § 3553(a)(1)].**

Remarkably, Roddis has never served anything close to the 15 year minimum sentence he faces here. The seriousness of his crime is reflected by the statutory punishment and takes into account his criminal history by virtue of the Section 851 enhancement. But it also is balanced by his personal characteristics and history. The Court already knows about Roddis' difficult childhood and crime-riddled early adulthood, but it does not know about his personal growth during his nearly five-year pretrial detention in this case.

Roddis has spent most of his pretrial detention at the Jerome Combs Detention Center in Kankakee. Since 2022, he has served as a trustee at the jail. This three year tenure is impressive, given that trustees are essentially at-will employees who can be fired without recourse whenever a correctional officer simply believes they have broken a rule. During his trustee tenure, Roddis once discovered a knife and promptly notified guards of the potential weapon. Another time, he found a key card that, in the wrong hands, could have been used to potentially escape the facility. Instead of selling the contraband to the highest bidder for

13

commissary money, he turned the key card in to correctional staff.

Whatever is thought of Roddis' personal history and characteristics, he simply is no longer the person who committed violent crimes in his late teens and 20s. He is a different man now. He hopes that he will be able to leave prison in time to lead a productive and law-abiding life in his remaining years.

### 2. The Need to Promote Respect for The Law, Just Punishment, Deterrence and Protection of the Public [18 U.S.C. § 3553(a)(2)].

A 15 year sentence for anything surely promotes respect for the law, just punishment and deterrence. It is nearly twice the length of the longest sentence Roddis served for his state crimes, and more than double that of the others. It inherently sends a message to Roddis and others that the lucrative methamphetamine trade simply is not worth the risk, and that federal drug crime laws are worthy of respect. For the reasons already discussed, a guidelines-range sentence based upon the 10-1 ratio for actual methamphetamine and the career offender guidelines does not promote respect for the law, just punishment, deterrence or protection of the public.

### 3. The Kinds of Sentences Available [18 U.S.C. § 3553(a)(3)].

Roddis is ineligible for probation and must serve a prison sentence, and the fluidity of his potential guideline range subjects him to tremendous uncertainty. In the event that this Court finds that a sentence exceeding 15 years is appropriate, he suggests a "lateral departure." For example, Roddis could be sentenced to the Bureau of Prisons for a term of 163 months, followed by a term of 21 months in a Residential Corrections Center, followed by a term of 21 months of home confinement and community service. Such a sentence would assuage any objection about a greater-than-appropriate deviation from the guidelines, and at the same time address Roddis' low risk of recidivism. It would allow him to begin the process of reentering society while still

14

serving his sentence.  And it would mean more time served for Roddis, since good time credit would not apply to any portion of the sentence.  This proposed sentence would mean 205 months actually served, which would be equivalent to a 242 month sentence served at 85 percent, which would be the midpoint of his guideline range using the relevant conduct calculated by Probation, the mixture guidelines, and without regard to the career offender guidelines.

### CONCLUSION

Roddis respectfully requests that this Court impose a sentence of the statutory minimum and the assessment of $100.00.  If the Court imposes a sentence in excess of the minimum, he asks that it consider a "lateral departure" to account for his diminished risk of recidivism and need to reenter society.  Finally, he requests that the Court recommend placement at an appropriate Bureau of Prisons facility located within the North Central Region, preferably FCI Pekin in Illinois.

RYAN RODDIS

By:     /s/ Brian Hiatt
        Brian Hiatt, his attorney

### CERTIFICATE OF SERVICE

The undersigned counsel certifies that he served a copy of this document by notification via the electronic filing system of the Clerk of the United States District Court, Central District of Illinois on July 15, 2025, to the following attorneys and/or parties of record:

Rachel Ritzer, Assistant United States Attorney
rachel.ritzer@usdoj.gov

/s/ Brian Hiatt_____
Brian Hiatt

Brian G. Hiatt P.C.
One Dearborn Square, Suite 655
Kankakee, IL  60901
(815) 304-5441
brian@brianhiattlaw.com
ARDC No. 6256084